# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

01 JUL 20  AM 8: 10

| | | |
|---|---|---|
| ETHEL B. HOUSTON, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant | ) | |
| | ) | |
| v. | ) | CV 00-BU-1544-S |
| | ) | |
| JEFFERSON COUNTY COMMISSION; RANDY GODEKE, Director of the Department of Revenue, in his official and individual capacity, | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs | ) | |

**ENTERED**

JUL 2 0 2001

## Memorandum Opinion

In her second amended complaint, Plaintiff the above-styled action, Ethel B. Houston, claims that she was terminated and otherwise subjected to adverse employment action because of race and in retaliation for filing charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), in violation of the federal civil rights laws, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981; and 42 U.S.C. § 1983. Now before the Court is a motion for summary judgment (Doc. 33) filed on April 18, 2001, by Defendants, the Jefferson County Commission and Randy

46

Godeke, who is sued in both his individual capacity as well as his official capacity as the Director of the Department of Revenue of Jefferson County, Alabama (hereinafter collectively "Defendants"). The parties have filed evidence and briefs in support of their respective positions on the motion, which is now ripe for decision. Defendants have also filed a motion to strike portions of Plaintiff's declaration, submitted in opposition to Defendants' motion for summary judgment, on the ground that such portions allegedly contradict Plaintiff's prior deposition testimony. (Doc. 45). The Court concludes that Defendants' motion to strike is due to be denied[1] and that Defendants' motion for summary judgment is due to be granted in part and denied in part. In addition, the Court has determined, sua sponte, that summary judgment is also warranted on Defendants' counterclaims alleging that Plaintiff breached a settlement agreement by bringing her federal claims. Defendants will be given an opportunity, however, to demonstrate the existence of a genuine issue of material fact before such counterclaims are dismissed.

## I. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

---

[1]Defendants contend that Plaintiff's affidavit is due to be struck because it allegedly conflicts with her prior deposition testimony. See Lane v. Celotex Corp., 782 F.2d 1526 (11th Cir. 1986). However, the Court concludes that regardless of whether Plaintiff's affidavit is considered, the result of Defendants' motion for summary judgment is the same. Therefore, Defendants' motion to strike will be denied.

P. 56(c).  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, at 323.  See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial."  Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994).  In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor.  Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)).  "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299).

## II.  BACKGROUND[2]

---

[2]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

Godeke became the Director of the Department of Revenue of Jefferson County (hereinafter the "Revenue Department") in 1991. At the time Godeke assumed that post, Plaintiff Houston, who is African-American, was already employed with the Revenue Department, where she worked in Birmingham issuing hunting, fishing, and boating licenses. There is no dispute that from the time Godeke first assumed the Director's position through Plaintiff's termination, Plaintiff's overall work attendance was generally poor.

After a period with a particularly high number of unexcused absences, Godeke, who is white, sent Plaintiff a memorandum dated March 23, 1994, advising her that since the first of that year she had been absent a total of 111.50 hours during her division's "peak seasonal busy season," as she had been absent without leave ("AWOL") 60.25 hours, sick with pay 25.75 hours, and taken 25.50 hours of annual leave. Godeke suggested that although her supervisors had previously discussed her attendance problems with her, she had evidently failed to take any corrective actions. He then warned: "Ethel, I need someone that will be at work more than 75% of the time. I cannot tolerate your past history of absences. Unless I see a significant improvement in your attendance, I will be forced to take disciplinary action."

Soon thereafter, on April 5, 1994, Godeke sent Plaintiff another memo, this time informing her that the Jefferson County Commission (hereinafter the "Commission") had recently adopted Administrative Order 94-2, which established a policy and procedure governing unpaid leaves of absence for county employees. Godeke also stated that he had done "a quick case study" of Plaintiff's sick leave attendance record and found that such was "not acceptable," noting that she had

accumulated zero hours of sick leave after approximately seven-and-a-half years of employment with Jefferson County (hereinafter the "County").   Godeke admonished, "In order for you to maintain your employment with Jefferson County, it will be necessary for you to make a significant and immediate improvement in your attendance record." He concluded by advising Plaintiff that when she was going to take sick leave henceforth she would have to, among other things, provide to her supervisor immediately upon returning to work a completed sick slip signed by a physician. If Plaintiff failed to do so, Godeke wrote, she would be denied sick leave, marked AWOL, and become subject to disciplinary action.

Godeke also sent Plaintiff similar memos dated August 18, 1994, and November 28, 1995, further warning her about her attendance deficiencies. The latter of these suggests that Plaintiff had indicated to Godeke that her doctor had prescribed her to take medication that was creating side-effects impairing her attendance.   In both of these memos, Godeke noted that he had monitored Plaintiff's attendance and found that her overall record had "not improved" since previous warnings.  He also indicated in each memo that he held suspicions that Plaintiff was abusing the use of paid sick leave, stating in one: "[Y]ou seem to become sick immediately after you have earned sick time and vacation time for the month. There is a definite pattern, a high degree of forecasting when you are going to call in sick." Godeke reminded Plaintiff that she was still required to follow the instructions for taking leave set forth in the April 5, 1994 memo, including the submission of doctor's excuses, and he further told her that any requested vacation time had to be requested in writing at least 48 hours in advance of the requested time off.

Godeke issued no further written warnings to Plaintiff about her attendance until early 1997. However, Godeke acknowledges that Plaintiff's attendance record in 1996 "left a lot to be desired." Indeed, it would appear that Plaintiff's overall attendance for 1996 was more or less about as bad as it had been in 1994 and 1995. While Plaintiff was present for about 88% of her total work hours for 1994, she was present about 84% of the time in both 1995 and 1996.[3] In each of 1994 and 1995, Plaintiff was charged with being AWOL about 80 hours, while she was deemed AWOL more than twice as much in 1996, almost 175 hours. On the other hand, by the end of 1994 and 1996, Plaintiff actually had officially accumulated about 30 hours of unused vacation and 8 hours of unused sick leave, while in 1995 she exceeded her allotment of vacation by about 21 hours and her allotment of sick leave by about 12 hours.[4]

On February 21, 1997, Godeke issued to Plaintiff a written counseling record informing her that the Revenue Department was undergoing a reorganization and that Plaintiff was going to be assigned to a new division under a different immediate supervisor, Ann Randolph, beginning March 1, 1997. This document also reveals that Godeke told Plaintiff that her past tardiness and attendance record would not be tolerated. He concluded by stating to her that if "her attendance record did not improve and the medical doctors could not cure the problems, . . . she should apply for disability or run the risk of loosing (sic) her job."

---

[3]Plaintiff's "Attendance Recap" sheets, Defendants' Exhibit 2, show that each work year is broken down into 26 two-week pay periods of 80 hours each, for a total of 2080 hours per year. Plaintiff worked 1841.5 hours in 1994, 1756.25 hours in 1995, and 1750 hours in 1996.

[4]According to Godeke's testimony, Plaintiff accrued 8 hours of vacation and 8 hours of sick leave each month she worked, for a total of 96 hours per year of each type of leave.

On February 26, 1997, Plaintiff filed her first charge of discrimination with the EEOC, complaining specifically that her employer had discriminated against her on the basis of disability, in violation of the Americans with Disabilities Act ("ADA").   Plaintiff alleged that she had been diagnosed with an unspecified disability in approximately August 1995 and that, despite the fact that her employer had been notified of such disability, she had been denied the opportunity to use accrued vacation or paid sick leave when she was off work due to her disability.   In addition, Plaintiff claimed that she believed her impending transfer to another department was attributable to disability discrimination.   Godeke received notice of this EEOC charge on March 3, 1997.

On May 14, 1997, Godeke met in his office with Plaintiff for a formal counseling session, which was witnessed by Ann Randolph.   In a memo dated the next day memorializing the central issues discussed at the meeting, Godeke wrote in a contemporaneous style as follows:

> Since last meeting of February 21, 1997, you have been absent 63.75 hours, 8 days in 2 ½ months.
>
> You have not produced any Doctor excuses or appointment confirmations as request (sic) in writing.
>
> Have you contacted Personnel Board on transfer to evening shift work?   Contacted any department?
>
> One of us is going to probably lose their job over this, and I prefer to keep mine.
>
> Ethel said she was going to her Doctor Friday, May 16, 1997.   I told her I wanted a diagnosis and prognosis from her Dr.   I also told her to ask her Dr. if she was a candidate for disability.

I asked Ethel about her attendance at her part-time job at Eckerd's. She did not know if she had missed any scheduled time or not. Ann told Ethel when she had migraines her Doctor told her she need to rest and remove as much stress as possible.

I physically changed places with Ethel and asked her what she, as Director, would recommend in this case. She did not offer a solution or a recommendation.

She proceeded to tell us about her medical discharge from the military in 1982 and her mother's death in 1991, but said her life was about as normal as anyone else's now.

Ann encouraged her to find an evening shift job and told Ethel she had checked with Personnel Board this morning and there were some openings at Cooper Green Hospital and the County Home.

I told Ethel I would recommend her a 3-month leave to get her medical problem straightened out. That way we would at least know she would not be scheduled to work and Ann and the other co-workers could schedule accordingly.

I concluded by telling Ethel the next time we had this type of conversation it would be in front of [Jefferson County] Commissioner [Mary] Buckelew.[5]

Plaintiff's Exhibit 2 (footnote added).

On June 3, 1997, after consulting a county attorney, Godeke presented to Plaintiff a memorandum entitled, "LAST WARNING." In it, Godeke charged that since Plaintiff was transferred to her new division at the end of February 1997 she

---

[5]The record indicates that Godeke, as a department head, did not have the unilateral authority to terminate or suspend an employee under his supervision. Rather, he could merely recommend that such action be taken by the Jefferson County Commission, whose President is Mary Buckelew.

had failed to bring in a signed sick slip on a number of occasions where she failed to report to work and claimed to be ill. This, Godeke reminded Plaintiff, was in violation of the requirements Plaintiff had to fulfill if she were to take sick leave, as per the April 5, 1994 memo. Godeke ended the memo with this caution:

> This is your last chance. There will be no more warnings and no more counselings. The next time you fail to provide your supervisor with the proper sick leave, you will be marked absent without leave and you will be disciplined. And that discipline may result in the termination of your employment with the County.

It is undisputed that Plaintiff's attendance did not improve following her receipt of the "LAST WARNING" memo. For the year 1997, Plaintiff was present for only about 82% of her total work hours, and she was deemed AWOL 145 hours, 114.25 of which were compiled after Plaintiff received the memo. Plaintiff also used up all 96 of her 1997 sick leave hours, and she exceeded her 1997 vacation quota by 44.25 hours. Plaintiff's pattern of absences continued into early 1998. Through the pay period ending March 13, 1998, Plaintiff is listed as having been present about 84% of her work hours from the beginning of the year, and she was deemed AWOL 27.75 hours.

On March 20, 1998, Godeke ordered Plaintiff to submit to a drug screening test. Godeke testified that he believed he had a "reasonable suspicion" Plaintiff was using drugs, as required under the county drug testing policy, based upon her habitual and predictable absences and tardiness in the mornings and because she allegedly had sounded "groggy" on some of her call-ins. Godeke acknowledges that he had never before required Plaintiff to take a drug test, although he also admitted that he probably would have had grounds to do based upon her consistently poor attendance record. When asked why he waited until this time to make this demand

upon Plaintiff, only after she had filed an EEOC charge, Godeke said that he had simply forgotten that the option was available until he was reminded of it during a discussion of Plaintiff's situation with the county attorney.  Godeke admits that he knew at the time he ordered the drug test that the County Commission could terminate Plaintiff's employment were she to fail.  The result of this drug test, however, is not indicated in the record, although Plaintiff expressly denies ever abusing drugs, legal or illegal.

Sometime in June or July 1997, Plaintiff filed an amendment to her then-still-pending EEOC charge.[6]  This amended charge was identical to her original charge alleging disability discrimination with two exceptions.  First, in the boxes used to indicate the type of unlawful discrimination alleged, Plaintiff's original charge had an "X" placed only in the box marked "disability," while her amended charge also had an "X" in the box marked "retaliation."[7]  And second, Plaintiff added a single sentence in her amended charge alleging that she believed Godeke was harassing and retaliating against her because she had filed her original charge against the Revenue Department.  On July 8, 1998, the EEOC mailed to Plaintiff a right-to-sue letter covering both her original and amended charges of discrimination, which had been consolidated under the same charge number, 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.  This notice, which

---

[6]It is unclear precisely when Plaintiff filed this amended charge, as the copy of it contained in Defendants' evidentiary submission, Exhibit 26, is undated.  In her brief, Plaintiff suggests that she filed this amendment relatively soon after she received the "FINAL WARNING" memo in early June 1997.  Defendants assert in their brief that Plaintiff filed this amendment in July 1997.  In any event, the exact date Plaintiff filed this amended EEOC charge is not material to any issue raised on summary judgment.

[7]Although there was also a box for "race" on the forms used for these original and amended charges, Plaintiff did not mark that box on either charge.

indicated Plaintiff had until 90 days after her receipt thereof to file a lawsuit, was received by Defendants on or about July 10, 1998.

Beginning in August 1998, Godeke had prepared a log tracking each of Plaintiff's absences, including whether she provided a sick slip completed and signed by a physician for each. This document indicates that between August 17, 1998 and October 27, 1998, Plaintiff was absent from work entirely on 13 occasions, with three of these being deemed as sick leave, and the rest being absences without leave. It further suggests that during that same period Plaintiff also missed parts of seven other work days, from between 2½ and 4 hours per day, totaling 24 hours. Three-and-one-half hours of this total was considered sick leave, while Plaintiff was registered as AWOL for the remainder. Finally, the log indicates that Plaintiff failed to provide a doctor's excuse for any of the foregoing time missed.

At about 2:50 p.m. on Friday, November 6, 1998, Godeke hand delivered to Plaintiff a "Contemplated Disciplinary Action" form, which notified Plaintiff that she was being formally charged with violations of five rules of the Jefferson County Personnel Board (hereinafter the "Personnel Board"). First, the notice alleged that Plaintiff had engaged in "conduct unbecoming an employee in the public service," based upon her poor overall attendance record since being transferred to the Revenue Department in 1987. Next, Plaintiff was alleged to have been absent without leave a total of 247.25 hours (30.90 days) in addition to her allocated vacation and sick leave during the 1998 calendar year.[8] Finally, Plaintiff was

---

[8]The record further shows that Plaintiff's attendance in 1998 was, in fact, worse than it had been in any calendar year since 1994, which is when she received her first warning memo from Godeke. The record indicates that she was present slightly less than 76% of her total work hours in 1998, and her 247.25 hours of AWOL that year were 72.5 hours more than she had ever accumulated in a single year.

charged with violating rules allowing for discipline where an employee is in "neglect of duty," in "violation of any lawful or reasonable order made and given by a superior officer," and "for any other reason deemed to be in the best interest of the public service." Such were all based upon Plaintiff's failure to provide sick slips for her absences between August 17 and October 27, 1998, as required by the memos to Plaintiff dated April 5, 1994 and June 2, 1997. At the time Plaintiff was served with this notice, she was also advised that she was to appear at a hearing upon the contemplated discipline. This hearing was scheduled for November 10, 1998 before the President of the Jefferson County Commission, Mary Buckelew, who had the power under state law to officially terminate Plaintiff's employment.

Late the same Friday afternoon, November 6th, Plaintiff was given the "Contemplated Disciplinary Action" notice, Plaintiff filed a written request for "vacation for paid sick leave," seeking to be off work the entire day on November 10, 1998, because she had two doctor appointments. The record indicates that at the time Plaintiff made this request she had been deemed AWOL for 247.25 hours of the calendar year. However, she officially also had accrued approximately 15 hours of unused vacation time. Nonetheless, Godeke denied Plaintiff's leave request, sending her a memo the following Monday, November 9, 1998, explaining that the leave Plaintiff sought for the next day conflicted with the disciplinary hearing scheduled before Commissioner Buckelew. Godeke counseled:

> You are directed to report to work tomorrow and you are directed to appear at Commissioner Mary Buckelew's office at 3:00 p.m. You are advised that failure to report to Commissioner Buckelew's office tomorrow will be considered as an abandonment of your job and this hearing will progress and a decision will be made in your absence.

Def. Exhibit 22.

On November 10, 1998, Plaintiff was advised that Commissioner Buckelew had formally terminated her employment for the reasons stated in the notice of contemplated disciplinary action. The personnel record of Plaintiff's termination expressly stated that she was dismissed for excessive absenteeism and was coded, "would not recommend for rehire." On November 18, 1998, Plaintiff appealed her termination to the Personnel Board, as permitted by state law. In her notice of appeal, Plaintiff admitted her guilt "in part," but she claimed that the action taken against her was too severe a penalty.

While that appeal to the Personnel Board was pending, Plaintiff filed another EEOC charge, number 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, on May 4, 1999. This time Plaintiff alleged discrimination on the basis of race, disability, and retaliation, in violation of both the ADA and Title VII. Plaintiff again claimed that her employer had denied her the ability to use vacation and sick leave when she was off of work due to her disability and that she had been transferred to another department in March 1997. Plaintiff additionally asserted that her termination was motivated by unlawful discrimination.

Meanwhile, Plaintiff and Jefferson County (the "County") entered into a settlement agreement that, by its terms, "dispos[ed] of all claims before the [Personnel] Board in this case." (Hereinafter the "Settlement Agreement"). Under the Settlement Agreement, which was signed by both Plaintiff and her attorney on July 26, 1999, Plaintiff would submit an unconditional resignation dated retroactive to the date of her firing, which the County would accept in lieu of her termination. Plaintiff's county personnel file would thus show her as having resigned rather than having been fired, although it was stipulated that such record would still be coded,

"would not rehire." The parties further agreed, however, that Plaintiff would be free to seek employment with any jurisdiction other than Jefferson County that was within the merit system administered by the Personnel Board. After being advised of the Settlement Agreement, the Personnel Board dismissed Plaintiff's appeal challenging the propriety of her termination.

Soon after the Settlement Agreement was signed, Defendants received notice, on August 2, 1999, that Plaintiff had filed an EEOC charge on May 4, 1999. In response, Jeffrey Sewell, a county attorney, wrote to the EEOC investigator advising him that Plaintiff had entered into the Settlement Agreement, a copy of which was attached. Sewell opined that such agreement constituted a waiver by Plaintiff and rendered "pointless" further action by the EEOC. Notwithstanding that the Settlement Agreement neither mentioned nor expressly resolved claims relating to federal discrimination law, Cynthia G. Pierre, an EEOC District Director, apparently agreed, as she sent a letter addressed to Sewell dated August 31, 1999, entitled "<u>ACKNOWLEDGMENT OF SETTLEMENT</u>," which stated as follows:

> In view of the agreement reached between the [County] and the person claiming to be aggrieved, the Equal Employment Opportunity Commission (EEOC) shall take no further action on behalf of the person claiming to be aggrieved.
> EEOC will discontinue its investigation of the [May 4, 1999] charge. This action does not reflect any judgment by the EEOC as to the merits of the charge or the terms of the settlement. Furthermore, EEOC does not waive its right to investigate any other charge, including a charge filed by a member of the Commission, or to

institute a directed ADEA or EPA investigation against the [County].[9] (Footnote added). This letter further indicates that a copy was sent to Plaintiff's counsel. Nonetheless, the EEOC subsequently issued a formal right-to-sue letter to Plaintiff on March 31, 2000, corresponding to her May 4, 1999 charge, advising that she had 90 days from her receipt thereof to file an action in federal court.

Plaintiff filed the instant action on June 5, 2000, asserting causes of action under Title VII and 42 U.S.C. § 1981 ("§ 1981") against the County, the Commission, the Personnel Board, the Revenue Department, and Godeke in his official capacity as the Director of the Revenue Department. Following the filing of the second amended complaint, which now controls this case, Plaintiff seeks to recover only from the Commission and Godeke. Plaintiff brings claims against the Commission under Title VII, § 1981, and 42 U.S.C. § 1983 ("§ 1983") and against Godeke, in both his official and individual capacities, under only § 1981 and § 1983. As the basis for all of her claims, Plaintiff alleges that Defendants have unlawfully discriminated against her "because of her race and in retaliation for her previous complaints of discrimination" and that such discrimination manifested itself in the form of her termination, disparate work assignments, discipline, evaluations, and other adverse terms and conditions of employment. Second Amended Complaint ¶¶ 7, 14. On these claims, Plaintiff seeks a declaratory judgment holding that Defendants have violated Title VII, § 1981 and § 1983, a permanent injunction prohibiting Defendants from violating these statutes in the future, as well as

---

[9]The evidence is not disputed that the only charge Plaintiff had pending at the time her counsel received this letter was the one filed May 4, 1999. Also, there is no indication that Plaintiff has ever alleged that her employer violated either the "ADEA," i.e., the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.; or the "EPA," i.e., the Equal Pay Act, 29 U.S.C. § 206(d).

damages, costs, and attorney's fees.  See id., part IV. In response, the Commission and Godeke filed state law counterclaims alleging that, by bringing this action, Plaintiff has breached the Settlement Agreement. Defendants have now filed the instant motion for summary judgment on all claims, as well as a motion to strike portions of Plaintiff's declaration.

## III.  DISCUSSION

### A.  Housekeeping

The Court deems it necessary to discuss the statutes pursuant to which Plaintiff purports to proceed on her causes of action, as there appears to be considerable confusion on the subject.  Plaintiffs complaint cites only under Title VII, § 1981, and § 1983 as the statutes upon which she bases all of her claims. Nonetheless, Defendants have assumed in their summary judgment brief that Plaintiff has brought claims under the ADA as well, as Defendants argue she cannot maintain claims alleging discrimination on the basis of disability.  However, Plaintiff has expressly disclaimed reliance upon the ADA, which prohibits employers from either discriminating on the basis of disability or retaliating against those who would make certain complaints about such discrimination.  On the other side, Plaintiff has sought to bring retaliation claims under Title VII and § 1981, but the Court has determined that it is undisputed that her only alleged protected activity upon which any employment action was even potentially taken against her involved complaints alleging discrimination on the basis of disability; while such retaliation claims are cognizable under the ADA, they are not cognizable under Title VII or § 1981.

### 1.  Race Discrimination

First, Plaintiff has brought claims of unlawful race discrimination pursuant to Title VII, § 1981, and § 1983.  Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 guarantees to all persons in the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Following the passage of the Civil Rights Act of 1991, the term "make and enforce contracts" is broadly defined as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1983 creates a civil cause of action for any person deprived of any rights, privileges, or immunities, secured by the Constitution and laws, by another person acting under color of state law.  42 U.S.C. § 1983.[10]  Although she does not explicitly so state, Plaintiff presumably bases her § 1983 race discrimination claim upon an alleged violation of the Equal Protection Clause. See Bass v. Board of County Com'rs, Orange County, Fla., ___ F.3d ___, ___, 2001 WL 765620, *18 (11th Cir. July 9, 2001). The Eleventh Circuit has explained that the substantive law and proof requirements of Title VII, § 1981, and § 1983 are the same for claims alleging intentional employment discrimination based on race by state actors.  Alexander v. Fulton County, Ga., 207 F.3d 1303,

---

[10]Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ." 42 U.S.C. § 1983.

1314 n.6 (11ᵗʰ Cir. 2000).

However, Plaintiff may not maintain her § 1981 discrimination claims independently of her claims brought under § 1983 alleging equal protection violations.    In Jett v. Dallas Independent School District, 491 U.S. 701, 735 (1989), the Supreme Court held that § 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."  Accordingly, because Defendants are state actors, Plaintiff's § 1981 race discrimination claims are effectively merged into her parallel § 1983 claims. See Vason v. City of Montgomery, Ala., 240 F.3d 905, 906 n.1 (11ᵗʰ Cir. 2001); Butts v.. County of Volusia, 222 F.3d 891, 894 (11ᵗʰ Cir. 2000).

### 2. Retaliation

Plaintiff has also brought retaliation claims, supposedly founded upon Title VII, § 1981, and § 1983.  In addition to prohibiting employers from discriminating on the basis of race, Title VII makes it unlawful:

> for an employer to discriminate against any of his employees or applicants for employment, . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a).  Following the passage of the Civil Rights Act of 1991, retaliation claims against private employers are also generally cognizable in this circuit under § 1981 where adverse employment action is taken against a plaintiff who makes at least certain kinds of complaints against race discrimination.  See Holiness v. Moore-Handley, Inc., 114 F.Supp. 2d 1176, 1185 (N.D. Ala. 1998); Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405, 1413 (11ᵗʰ Cir. 1998). To the extent Plaintiff brings a § 1983 based upon allegations that she was dismissed

because of her expressive activity, such arises under the First Amendment. <u>Watkins v. Bowden</u>, 105 F.3d 1344, 1354 (11th Cir. 1997). A pure or generic retaliation claim, based upon a plaintiff's complaints regarding race discrimination, simply does not implicate the Equal Protection Clause.[11] <u>Id.</u>

However, the Court finds that the evidence clearly establishes that Plaintiff may not maintain any of her retaliation claims pursuant to either Title VII or § 1981. In order to make out a prima facie case of retaliation under Title VII, a plaintiff must show that she that she engaged in activity protected by that statute. See <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 587 (11th Cir. 2000); <u>Farley v. Nationwide Mut. Ins.</u>, 197 F.3d 1322, 1336 (11th Cir. 1999); <u>Little v. United Technologies</u>, 103 F.3d 956, 959 (11th Cir. 1997). Although the Eleventh Circuit has indicated that retaliation claims are also cognizable under § 1981, it has been said recently that it is an "open question" as to whether the elements of such a claim are identical to those for a Title VII retaliation claim. <u>Bass</u>, ___ F.3d at ___ n.10. However, to the extent that § 1981 retaliation claims are, in fact, viable, it is presumable that a plaintiff would have to prove that she engaged in some sort of similar protected activity with regard to complaining about <u>race</u> discrimination. See <u>Holiness</u>, <u>supra</u>.

The expression upon which Plaintiff bases her retaliation claims is her filing of discrimination charges with the EEOC. Of course, an employee's filing of an

---

[11]Given the Eleventh Circuit's apparent willingness to allow retaliation claims under § 1981 the question arises whether such a claim against a state actor is similarly merged into a § 1983 cause of action, as occurs with § 1981 claims alleging intentional race discrimination under the Supreme Court's opinion in <u>Jett</u>, <u>supra</u>. However, because the Court concludes, for reasons discussed in text below, that Plaintiff may not maintain a retaliation claim under § 1981, the Court need not wade into that thicket.

Page 19 of 49

EEOC charge alleging that her employer has discriminated on the basis of race or some other category protected under Title VII is statutorily protected. See <u>Pettway v. American Cast Iron Pipe Co.</u>, 411 F.2d 998, 1003-06 (5th Cir. 1969). In addition, even if the conduct about which an employee complains does not, in fact, constitute an employment practice made unlawful by Title VII, the employee's complaint will still be protected provided that she had a good-faith, objectively reasonable belief that the employer's conduct violated Title VII. <u>Harper v. Blockbuster Entertainment Corp.</u>, 139 F.3d 1385, 1388 (11th Cir. 1998). However, neither Plaintiff's original EEOC charge, filed February 26, 1997, nor her amendment to that charge sometime prior to July 8, 1998, contained any suggestion of discrimination based upon race or any other category protected under Title VII. Rather, her original charge expressly alleged discrimination solely upon the basis of <u>disability</u>, and her subsequent amendment to that charge added only the allegation that she believed she had been retaliated against for filing the original charge. It was not until Plaintiff filed an EEOC charge on May 4, 1999 that she first made any complaint to the effect that she believed she had been subjected to race discrimination. Plaintiff admits, however, that Defendants did not take any action against her based upon that last charge, as she had already been fired when she filed it. Plaintiff's retaliation claims are thus limited to adverse action allegedly taken against her by Defendants because of her first EEOC charge and/or the amendment thereto. But because both of those charges pertained only to discrimination on the basis of disability and retaliation for filing a charge alleging disability discrimination, neither of those filings pertained to any employment practice even potentially deemed unlawful by Title VII. See <u>Jarrett v.</u>

Sprint/United Management Co., 37 F.Supp. 2d 1283, 1287 (D. Kan. 1999) (Title VII does not protect an individual from discrimination on the basis of an actual or perceived disability); Williamson v. Hartmann Luggage Co., 34 F.Supp. 2d 1056, 1063 (M.D. Tenn. 1998) (same). Therefore, it necessarily follows that neither Plaintiff's original nor her amended charge can be considered expression protected by Title VII for purposes a retaliation claim brought under 42 U.S.C. § 2000e-3(a). See McKee v. Ball State University Bd. of Trustees, 2000 WL 988518, *5 (S.D. Ind. 2000) (a claim of retaliation for requesting accommodation for a disability falls under the ADA, not Title VII); Seaman v. C.S.P.H., Inc., 1997 WL 538751, *21 (N.D. Tex. 1997) (plaintiff failed to state a retaliation claim under the ADA where his alleged protected activity was filing an EEOC charge that alleged discrimination on the basis of religion and sex, but not disability). Cf. Chanda v. Engelhard/ICC, 234 F.3d 1219, 1225 (11th Cir. 2000) (plaintiff failed to comply with the administrative requirements of a Title VII retaliation claim where his EEOC charge alleged discrimination pertaining to an alleged disability, but not national origin). Likewise, because the only type of retaliation claim even possibly viable under § 1981 would require a showing that an employer took action against an employee because of complaints of race discrimination, Plaintiff cannot maintain a retaliation claim under § 1981, either.

Defendants have conceded in their brief, however, that Plaintiff has engaged in protected expression by virtue of her original and amended EEOC charges. And indeed she has. The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees,

employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[12]  The ADA also provides a cause of action for an individual who is subjected to retaliation by an employer because he or she has "opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."  42 U.S.C. § 12203(a). Thus, Plaintiff's filing of EEOC charges alleging discrimination on the basis of disability is protected activity for purposes of an ADA retaliation claim.  See, e.g., Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).

### 3.  Claims against Godeke in his individual capacity

As stated previously, Plaintiff has brought claims against Godeke in both his official and individual capacities.  Defendant has argued that the claims against Godeke are due to be dismissed insofar as they are brought against him in his individual capacity.  Whatever the merits of such argument, Plaintiff has responded by conceding that she "does not oppose Godeke being dismissed from this lawsuit in his 'individual' capacity."  Accordingly, Plaintiff's claims against Godeke in his individual capacity will be dismissed, leaving only the claims against Godeke in his official capacity.[13]

---

[12]Defendants have argued in their summary judgment brief that Plaintiff cannot maintain any claim under the ADA alleging unlawful discrimination on the basis of a disability. However, Plaintiff has not asserted such a claim in her original or amended complaints, and in her brief in opposition to Defendants' motion for summary judgment she has expressly disavowed that she is attempting to recover on such a claim in this action.

[13]Where a plaintiff brings an action against a public official in his official capacity, the suit is against the office that official represents, and not the official himself.  Welch v. Laney, 57 F.3d 1004, 1009 (11th Cir. 1995).

### 4. Summary

Based on the foregoing, the Court concludes that Plaintiff continues to assert the following claims: (1) a Title VII race discrimination claim against the Commission; (2) race discrimination claims against both the Commission and Godeke in his official capacity based on the Equal Protection Clause, brought pursuant to § 1983, which also encompasses parallel § 1981 race discrimination claims; (3) an ADA retaliation claim[14] against the Commission[15]; and (4) § 1983 retaliation claims, based upon the First Amendment, against the Commission and Godeke in his official capacity. With that out of the way, the Court now proceeds to consider Defendants' specific arguments that it is entitled to summary judgment on each of these claims.

### B.    Waiver under the Settlement Agreement

Defendants first contend that they are entitled to summary judgment on all of Plaintiff's claims to the extent that the relief she is seeking includes reinstatement or rehire with the County, because she expressly agreed as part of the July 26, 1999 Settlement Agreement that she would not be eligible for and would not seek rehire by the County. It is true that Plaintiff did make such a stipulation in consideration

---

[14]While Plaintiff's second amended complaint has cited Title VII and Section 1981 as the statutory sources of her retaliation claim, the Court will simply proceed in this case as if Plaintiff had originally brought this claim properly under the ADA. The Court does so because (1) Defendants did not raise this issue in their initial brief in support of summary judgment; (2) Defendants concede in that brief that Plaintiff has engaged in protected activity for purposes of a retaliation claim; (3) a complaint generally need not cite the statutory source of a claim so long as the facts alleged are sufficient to give rise to a cause of action, see Hildebrand v. Honeywell, Inc., 622 F.2d 179, 181 (5th Cir. 1980); and (4) an ADA retaliation is analyzed under the same rubric as a Title VII retaliation claim, see Farley, supra.

[15]Plaintiff may not maintain an ADA claim against Godeke because he is not himself an "employer" for purposes of that act. See Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir.1996).

for being allowed to resign instead of having the termination on her personnel record. However, Plaintiff's second amended complaint does not expressly seek to have Plaintiff reinstated to employment with the County, and in her summary judgment brief Plaintiff acknowledges expressly that she is not, in fact, seeking such relief. Therefore, the Court need not decide whether the Settlement Agreement would preclude Plaintiff from seeking re-employment with the County.

Defendants have also posited that one of the issues presented by their summary judgment motion is whether Plaintiff is estopped from pursuing her claims in this forum because she allegedly waived any and all claims by entering into the Settlement Agreement. Except to the extent that Defendants have contended that the Settlement Agreement bars Plaintiff from seeking re-employment with the County, Defendants have not developed this argument. Nonetheless, the Court would note that it is clear from the terms of the Settlement Agreement itself that it does not purport to cover any of the claims Plaintiff now brings under federal anti-discrimination law. When an employee knowingly and voluntarily releases an employer from liability for Title VII and § 1981 claims with a full understanding of the terms of the agreement, she is bound by that agreement. Bledsoe v. Palm Beach County Soil and Water Conservation Dist., 133 F.3d 816, 819 (11th Cir. 1998); Puentes v. United Parcel Service, Inc., 86 F.3d 196, 198 (11th Cir. 1996). It might be presumed that the same rule applies equally to releases involving claims alleging violations of other federal civil rights statutes. "The waiver of such remedial rights, however, 'must be closely scrutinized,' and a court must look to the totality of the circumstances to determine whether the release is knowing and voluntary." Id. (quoting Puentes, supra).

The Settlement Agreement in this case says nothing even hinting that it might release anyone from liability with respect to claims brought under federal civil rights laws. Indeed, it expressly states that it disposes only of "all claims before the [Jefferson County Personnel] Board in this case." (Emphasis added). The Personnel Board, however, lacks jurisdiction to adjudicate claims alleging violations of federal anti-discrimination law. See Ex parte Boyette, 728 So. 2d 644 (Ala. 1998). Thus, none of the claims Plaintiff now asserts could have been properly presented to the Personnel Board, and there is nothing in Plaintiff's notice of appeal to that body indicating that she contemplated that her federal discrimination or retaliation claims were at issue in that administrative appeal. The Court concludes that Defendants are not entitled to summary judgment on the ground that Plaintiff waived her federal claims by entering into the Settlement Agreement.

### C.   Defendants' Breach-of-Contract Counterclaims

Defendants have asserted state-law counterclaims based upon allegations that by bringing her federal discrimination and retaliation claims in this Court, Plaintiff has breached the terms of the Settlement Agreement she signed on July 26, 1999. But as the Court has determined, for the reasons discussed above, the Settlement Agreement clearly and unambiguously does not purport to operate as a waiver precluding Plaintiff's claims in this action. Thus, the record shows that Plaintiff has not breached the Settlement Agreement by filing suit. Accordingly, the Court concludes that there is no genuine issue of material fact and that Plaintiff is entitled to a judgment as a matter of law with respect to Defendants' counterclaims. However, while Plaintiff has argued in her brief in opposition to Defendants' motion for summary judgment that Defendants' counterclaims are due to be

dismissed, Plaintiff has never formally moved for summary judgment on those counterclaims. The Court, though, is empowered to grant summary judgment <u>sua sponte</u>, provided that the party against whom judgment will be entered is given at least 10 days advance notice and has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted. See Fed. R. Civ. P. 56(c); <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1204 (11th Cir. 1999); <u>Massey v. Congress Life Ins. Co.</u>, 116 F.3d 1414, 1417 (11th Cir. 1997). Accordingly, the Court will allow Defendants' the requisite time and opportunity to show why summary judgment should not be entered on their counterclaims before such issue is considered and ruled upon.

### D.   Adverse Employment Action

Next, Defendants make another argument relating to the effect of the Settlement Agreement and actions taken pursuant thereto on all of Plaintiff's claims. One of Defendants' principal contentions is that Plaintiff did not suffer any adverse employment action as required to maintain her discrimination or retaliation claims because she resigned from her employment. Defendants do not dispute that Plaintiff was told she was terminated effective November 10, 1998, pursuant to the action taken on that date by Commissioner Buckelew, upon the recommendations of Godeke and Ann Randolph. Defendants emphasize, however, that pursuant to the terms of the Settlement Agreement, Plaintiff was subsequently allowed to tender her unconditional resignation, dated retroactive to the day she was fired, which was then accepted by the County in lieu of her termination. Defendants contend that because Plaintiff and her counsel affirmatively and successfully negotiated that she be allowed to resign, she should not now be heard to claim that

she suffered an adverse employment action for purposes of her federal claims. The Court disagrees.

Each of Plaintiff's discrimination and retaliation claims requires her to prove, as part of a prima facie case, that she suffered an adverse employment action. See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (discussing adverse action requirement in context of Title VII claims); Alexander, 207 F.3d at 1314 n.6 (recognizing that the substantive law and proof requirements of Title VII, section 1981, and section 1983 are the same for claims alleging intentional employment discrimination based on race by state actors); McCabe v. Sharrett, 12 F.3d 1558, 1563 (11th Cir. 1994) (noting adverse employment action requirement in context of Section 1983 First Amendment retaliation claim). Of course, a showing that the plaintiff was actually discharged from employment will normally suffice to satisfy this element. Bass, 242 F.3d at 1014; McCabe, supra. The Eleventh Circuit has indicated that the inquiry as to whether an actual termination occurs when the employer, " 'by acts or words, shows a clear intention to dispense with the services of an employee.' " Thomas v. Dillard Dep't Stores, Inc., 116 F.3d 1432, 1434 (11th Cir. 1997) (quoting Payne v. Crane Co., 560 F.2d 198, 199 (5th Cir. 1977)[16]). In addition, an adverse employment action may be shown where it is proven that the plaintiff resigned under circumstances amounting to a constructive discharge because the plaintiff was told, in effect, that she had better quit before being fired. See Downey v. Southern Natural Gas Co., 649 F.2d 302, 305 (5th Cir. Unit B June 1981) (holding that the constructive discharge doctrine was applicable

---

[16]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

and precluded summary judgment where the plaintiff resigned after his supervisor allegedly told him that he "might" otherwise be terminated with a consequent loss of benefits); Burks v. Oklahoma Publ'g Co., 81 F.3d 975, 978 (10th Cir. 1996) ("[A]n employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired"). But see Summit v. S-B Power Tool, (Skil Corp.), a Div. of Emerson Elec. Co., 121 F.3d 416, 421 (8th Cir. 1997) (holding that an employee's being told that he or she will be fired for cause does not, in and of itself, constitute constructive discharge, but noting the potential conflict with Downey, supra). On the other hand, where an employee resigns in a fashion that is truly voluntary, such separation from employment does not constitute an adverse employment action for purposes of federal employment discrimination law. See Grigsby v. North Mississippi Medical Center, Inc., 586 F.2d 457, 461 (5th Cir. 1978) (holding that the plaintiff could not recover under Title VII where the evidence supported the district court's finding that the plaintiff's "resignation . . . was entirely voluntary and not a constructive discharge"); Hammon v. DHL Airways, Inc., 165 F.3d 441, 447 (6th Cir. 1999); Hartsell v. Duplex Products, Inc., 123 F.3d 766, 775 (4th Cir. 1997).

    It is undisputed that Plaintiff was, in fact, told on November 10, 1998 that her employment was terminated, effective that day. It was not until more than eight months later that she and the County agreed that Plaintiff's county personnel file would be changed to reflect that she resigned instead of being terminated. This alone would seem to suggest that Plaintiff was actually terminated and thus suffered an adverse employment action. Nonetheless, Defendants characterize Plaintiff's retroactive resignation pursuant to the Settlement Agreement as entirely

"voluntary" and argue that, as such, it vitiates the decision to discharge her. However, even assuming that Plaintiff's termination was "completely rescinded" as Defendants strenuously urge, the Court concludes that the record belies Defendant's claim that Plaintiff's tender of her back-dated resignation must be viewed as invalidating any adverse employment decision.

First, it is not the termination itself that is considered the illegal act; rather it is the actual <u>decision</u> to terminate and giving notice to the employee of that decision that are the relevant illegal acts under Title VII and similar statutes. See <u>Thomas</u>, 116 F.3d at 1434 n.4; <u>Calhoun v. Federal Nat. Mortg. Ass'n</u>, 823 F.2d 451, 456 (11th Cir. 1987); <u>Cocke v. Merrill Lynch & Co.</u>, 817 F.2d 1559, 1561 (11th Cir. 1987). Once the Plaintiff was told she was fired, Defendants could not simply undo its employment decision by having Plaintiff agree months later that such action would not be formally deemed a "termination" on her personnel record.

Second, there is no question that Plaintiff was not given, either at the time of her termination or at any time thereafter, any option of continued employment with the County. Even under the Settlement Agreement, she is forever barred from being eligible to seek re-employment with the County. As the Plaintiff had already been fired and had been advised in no uncertain terms that her services were no longer desired, the only question for Plaintiff was whether her separation from employment was to be formally deemed a resignation or a dismissal. Thus, it can hardly be disputed that Plaintiff's desire to have the termination on her personnel file formally changed to a resignation was founded solely upon hopes of salvaging her reputation for purposes of future employment opportunities. Defendants repeatedly stress that when the County agreed to allow Plaintiff to resign it

conferred a benefit upon her.  That is surely true, at least insofar as an involuntary dismissal on Plaintiff's personnel record would likely carry with it a greater stigma than would a "voluntary" resignation.  But it is immaterial.  Any employee allowed to resign in lieu of being terminated receives such a benefit.  Notwithstanding, courts have often expressly allowed that employees who have opted to resign instead of "choosing" to be fired may have been constructively discharged.  See Downey; supra; Rollison v. Gwinnett County, 865 F.Supp. 1564, 1570 (N.D. Ga. 1994) (finding a fact issue precluding summary judgment on the plaintiff's claim of constructive discharge where evidence indicated that the plaintiff was given a choice between resigning and having his supervisor recommend his formal termination); Scott v. Goodyear Tire & Rubber Co., 160 F.3d 1121, 1128 (6th Cir. 1998) (finding constructive discharge doctrine applicable where the plaintiff chose retirement with the understanding that he did not have the option of continued employment); Acrey v. American Sheep Industry Ass'n, 981 F.2d 1569, 1573-74 (10th Cir. 1992) (constructive discharge doctrine applicable where the employee was told to resign or she would be fired); Spulak v. K Mart Corp., 894 F.2d 1150, 1154 (10th Cir. 1990) (employee was constructively discharged when faced with choice between early retirement or being fired); Faruki v. Parsons S.I.P., Inc., 123 F.3d 315, 319 (5th Cir. 1997) (holding that the evidence was sufficient to find a constructive discharge where the plaintiff resigned after he was told by his supervisor that he should find another job because he could not be retained and that he had one week before he was placed on indefinite unpaid leave).

Moreover, courts have routinely assumed that there is no significant difference, for purposes of determining whether there has been an adverse

employment action, between an employee who has been fired and one who has been allowed to resign in lieu thereof. See, e.g., Watkins, 105 F.3d at 1348 (implicitly treating as a discharge plaintiff's resignation under threat of immediate involuntary dismissal, in the context of a First Amendment retaliation claim brought under Section 1983); Bevill v. UAB Walker College, 62 F.Supp. 2d 1259, 1270 (N.D. Ala. 1999) (same in a Title VII case); Roush v. KFC Nat. Management Co., 10 F.3d 392, 395 & n.3 (6th Cir. 1993); Barnes v. Yellow Freight Systems, 830 F.2d 61, 62 (5th Cir. 1987); McKenna v. Weinberger, 729 F.2d 783, 789 (D.C. Cir. 1984); Long v. Ford Motor Co., 496 F.2d 500, 502 (6th Cir. 1974); Das v. Ohio State University, 115 F.Supp. 2d 885, 891 (S.D. Ohio 2000). Cf. Bahl v. Royal Indem. Co., 115 F.3d 1283, 1293 (7th Cir. 1997) (holding that a plaintiff who was terminated could not establish a disparate treatment claim based upon his employer's allowing a similarly situated employee outside of the plaintiff's protected class to "voluntarily" resign in lieu of termination, given the "comparatively minimal difference in treatment"). If it were otherwise, an employer motivated to get rid of an employee, based upon a prohibited discriminatory consideration, could tell the employee that it has been decided that the employee will be fired "for cause" unless she "voluntarily" resigned instead, and the employer could do so with impunity if the employee chose to resign.[17] Insulating an employer from liability in such a

---

[17]It seems to the Court that just about every employee who is expressly allowed to "voluntarily" resign in lieu of termination has suffered an adverse employment action. Even where an employer tells its employee that she is about to be fired "for cause," and the employee resigns because he believes she is guilty of the alleged misconduct and reasonably wishes to preserve his reputation for purposes of future employment, it would be anomalous to preclude an employee from recovering under Title VII on the grounds that there has been no adverse job action. Of course, an employer's threat of immediate termination for cause actually may be prompted by the employer's perception that the employee's job performance is deficient. But

fashion would be inconsistent with the well-established principle that Title VII and similar remedial statutes prohibiting discrimination are generally to be construed liberally in favor of employees.  See <u>Cooper v. Lewis</u>, 644 F.2d 1077, 1084 (5th Cir. May 1981); <u>Coke v. General Adjustment Bureau, Inc.</u>, 640 F.2d 584, 594 (5th Cir. March 1981).  It would also be inconsistent with the admonition that it is the <u>decision</u> to terminate because of race or another protected characteristic, communicated to the employee, that is the illegal act.  In short, neither case law nor common sense counsels that an employee must force an employer to actually follow through with a promise to terminate an employee in order to bring suit under Title VII.  Regardless of whether the Plaintiff's separation from her employment is viewed as an actual termination or a constructive discharge,[18]

<hr/>

where an employee resigns in response, there still is, the Court would argue, an adverse job action; it simply is not motivated by any sort of prohibited discrimination.  However, even where an employee is guilty of misconduct, it might be shown that the employer's recital of "cause" in connection with a termination or a threat thereof is merely a smokescreen designed to obscure unlawful discrimination, such as where the employer treats more favorably employees outside of the plaintiff's protected class who have engaged in the same or similar misconduct.  See, <u>e.g.,</u> <u>Williams v. City of Montgomery</u>, 742 F.2d 586 (11th Cir.1984).

[18]In <u>Thomas</u>, <u>supra</u>, the Eleventh Circuit clearly sought to maintain an analytical distinction between actual and constructive discharges.  See 116 F.3d at 1434-35.  However, the case of an employee who is allowed to resign in lieu of termination does not seem to fit neatly within either category.  Of course, this case is unusual in that Plaintiff was undisputedly fired months before she ever "resigned."  But any employer who gives an employee an ultimatum to resign or be fired certainly would seem to have shown "a clear intention to dispense with the services of [that] employee," as required to show an actual discharge. But taking a more formal view, an employee who tenders a resignation has not "actually" been discharged by the employer.  It is she who has separated the employment relationship, at least officially, thus relieving the employer from having to make good on its threat of termination. Such can be fit into the framework of the typical constructive discharge case, in which the employee must show that her working conditions were so intolerable that a reasonable person in her position would have felt compelled to resign.  See <u>Hipp v. Liberty Nat. Life Ins. Co.</u>, ___ F.3d ___, ___, 2001 WL 575489, *14 (11th Cir. 2001); <u>Griffin v. GTE Florida, Inc.</u>, 182 F.3d 1279, 1283 (11th Cir. 1999); <u>Poole v. Country Club of Columbus, Inc.</u>, 129 F.3d 551, 553 (11th Cir. 1997).  The

because it is clear both that Plaintiff was fired initially and that she later requested to resign only to "clear" her personnel record and had no option of continuing employment, the Court concludes that there is sufficient evidence to indicate that Plaintiff suffered an adverse employment action for purposes of her discrimination and retaliation claims.

Defendants argue, however, that <u>Hargray v. City of Hallandale</u>, 57 F.3d 1560 (11th Cir. 1995), compels a determination that Plaintiff's resignation was voluntary and precludes that adverse action was taken against her. In that case, the Eleventh Circuit held that the plaintiff, Hargray, who had resigned his public employment under a threat of a criminal prosecution based upon his alleged misappropriation of city property, could not recover on his claim that the city's failure to provide him with a pre-deprivation hearing violated his procedural due process rights. The court acknowledged that if an employee's resignation was "so involuntary that it amounted to a constructive discharge," the protections of the Due Process Clause would be triggered, and that such would be the case if the resignation were obtained by coercion or duress. <u>Id.</u> at 1567-68. However, considering a number of factors,[19] the court held that the plaintiff's resignation was not coerced and was in fact

---

employee is "discharged" only in the "constructive" sense that she quit in response to the employer's "intolerable" threatening words and actions, which the employee might show, by direct or circumstantial evidence, were motivated by an unlawful discriminatory or retaliatory animus.

[19]The <u>Hargray</u> court stated that the following factors may be helpful in determining whether an employee's resignation was obtained by coercion or duress: (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel. 57 F.3d at 1568.

voluntary, noting that "[r]esignations obtained in cases where an employee is faced with . . . unpleasant alternatives [to resignation such as facing possible termination for cause or criminal charges] are nevertheless voluntary because 'the fact remains that plaintiff <u>had a choice</u>. [Plaintiff] could stand pat and fight.' " <u>Id.</u> (quoting <u>Christie v. United States</u>, 518 F.2d 584, 587 (Ct. Cl. 1975) (emphasis original)).

This Court finds <u>Hargray</u> distinguishable. First is the obvious difference that Plaintiff here, unlike Hargray, was actually considered to have been fired for eight months before tendering a resignation.   Defendants suggest that Plaintiff's termination was "voluntary" because she could have decided to "stand pat and fight." Presumably, Defendants are alluding to the fact that Plaintiff might have pursued reinstatement by the Personnel Board.   However, Plaintiff is not contending that she was denied due process; she had already been fired, and there is nothing in the record that might suggest she was required to exhaust internal grievance procedures before bringing her federal claims.   See <u>Peterson v. BMI Refractories</u>, 132 F.3d 1405, 1412 (11th Cir. 1998); <u>Brisentine v. Stone & Webster Engineering Corp.</u>, 117 F.3d 519, 526 (11th Cir. 1997). Which brings us to the other difference between <u>Hargray</u> and this case: <u>Hargray</u> simply does not address whether there had been an adverse employment action sufficient to support a discrimination or retaliation claim.   It is one thing to say, as the <u>Hargray</u> court in effect did, that an employee who has tendered a resignation in the face of threatened criminal charges cannot be heard to complain that he did not receive all the <u>process</u> that he was allegedly constitutionally due when he <u>could have availed himself of such process</u> if he had simply decided to challenge the charges of wrongdoing leveled against him. It is quite another to say that an employee has suffered no adverse

employment action where he or she agrees to resign in response to an employer's threats of immediate termination "for cause," where such threats are allegedly motivated by an unlawful discriminatory animus.[20] Cf. Cacy v. City of Chickasha, Oklahoma, 124 F.3d 216 (table), 1997 WL 537864, **7 (10th Cir. 1997) (where the plaintiff resigned from his public employment and brought a due process claim, the court rejected the applicability of employment discrimination cases holding that an employee can prove constructive discharge by showing that he or she was faced with a choice between resigning or being fired; those cases are distinguishable, the court stated, because they "do not deal with public employees facing disciplinary action, nor do they involve § 1983 actions against public employers"). The Court concludes that Hargray does not compel summary judgment for lack of an adverse employment action.

### E. Timeliness of Plaintiff's Claims

Defendants contend that some or all of Plaintiff's claims are barred because of her failure to file claims in a timely fashion upon her receipt of correspondence indicating that the EEOC was dismissing her charges of discrimination. In cases alleging a violation of Title VII, where the EEOC does not file suit or obtain a conciliation agreement, the EEOC is required to "notify the person aggrieved and within 90 days after the giving of such notice a civil action may be brought against

---

[20]The Hargray court's use of the term "constructive discharge" when discussing the voluntariness of a resignation could suggest that the opinion's reasoning may be applicable to whether an employee's resignation constituted a "constructive discharge" in the employment discrimination context. However, it is far from certain that such is the case. Nowhere did the Hargray court refer to the standard for constructive discharge commonly used in employment discrimination cases: that the employee's working conditions were so intolerable that a reasonable person in the employee's position would have felt compelled to resign. See Hipp; Griffin; Poole, supra.

the respondent named in the charge . . . by the person claiming to be aggrieved. . . ." 42 U.S.C. § 2000e- 5(f)(1).  See Zillyette v. Capital One Financial Corp., 179 F.3d 1337, 1339 (11th Cir. 1999).  The same is true with respect to cases alleging a violation of the ADA.  See 42 U.S.C. § 12117(a)[21]; Zillyette.  If not brought within 90 days of receipt of such notice, the plaintiff's claims relating to the referenced charge are barred.  Zillyette.

Defendants first argue that any claims encompassed within Plaintiff's original EEOC charge, filed February 26, 1997, and her later amendment to that charge, are precluded because Plaintiff received a right-to-sue letter on those consolidated charges on or about July 8, 1998, and she did not file the instant action until almost two years later, on June 5, 2000.  It is true that any ADA or Title VII claims that might have been encompassed within those consolidated EEOC charges would be barred as untimely.  However, this gains Defendants little.  Plaintiff's complaint does not assert claims encompassed within those first two charges, and Plaintiff expressly disavows in her brief that she has ever sought to bring such claims.

Defendants also contend that Plaintiff's discrimination and retaliation claims encompassed within her final EEOC charge, filed May 4, 1999, are also untimely.[22]

---

[21]42 U.S.C. § 12117(a) provides in pertinent part: "The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter . . . ."

[22]In their reply brief, Defendants also argue for the first time that Plaintiff's May 1999 EEOC charge is also deficient because it is allegedly not verified as required by 42 U.S.C. § 2000e-5(b), which provides, "Charges shall be in writing under oath or affirmation and be in such form as the Commission requires."  See Vason v. City of Montgomery, Ala., 240 F.3d 905 (11th Cir. 2001).  However, as this ground was not argued until Defendants submitted their reply,

Defendants acknowledge that on March 31, 2000, the EEOC issued a right-to-sue letter to Plaintiff regarding that last charge. Nonetheless, in arguing that Plaintiff's claims encompassed within that final charge are untimely, Defendants point to the correspondence dated August 31, 1999, in which the EEOC stated that, in view of the Settlement Agreement, the EEOC would "take no further action on" and "discontinue its investigation of" Plaintiff's May 4, 1999 charge. Defendants insist that by this letter, a copy of which was sent to Plaintiff's counsel, the EEOC gave notice that it "considered the matter closed." (Defendants' Brief at 29). Defendants thus suggest that it was such receipt by Plaintiff's counsel that commenced the 90-day period within which Plaintiff had to file suit, not Plaintiff's receipt of the formal right-to-sue letter issued on March 31, 2000.

Plaintiff does not dispute that her counsel received a copy of the August 31, 1999 letter sent from the EEOC to Sewell, as that letter indicates. Plaintiff argues, rather, that the subsequent issuance of a formal right-to-sue letter on March 31, 2000 establishes that the EEOC did not, in fact, consider the matter of her May 4, 1999, charge closed when it sent the prior notice. Therefore, Plaintiff seems to maintain, it was receipt of that formal right-to-sue letter that started the 90-day clock ticking, not the August 31, 1999 letter.

Under precedent binding in this circuit, if a plaintiff is notified (1) that

---

it is not properly presented. See <u>Bashir v. National R.R. Passenger Corp. (Amtrak)</u>, 929 F.Supp. 404, 413 (S.D. Fla. 1996). Moreover, the Court notes that Defendants' argument is entirely without merit. Plaintiff's signature is affixed immediately below the statement, "I declare under penalty of perjury that the foregoing is true and correct." She also signed the charge immediately below another statement, "I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief." Such is more than sufficient to satisfy the "oath or affirmation" requirement. See <u>Harper v. Plumbmaster</u>, Inc., 1998 WL 409007, *1, 77 Fair Empl. Prac. Cas. (BNA) 1058 (E.D. Pa. 1998). See also 28 U.S.C. § 1746.

conciliation efforts on his or her behalf have failed and (2) that the EEOC intends not to sue the respondent to a charge, the plaintiff has then received notice that the administrative proceeding is at an end, and the 90-day period begins to run at that point.  Crawford v. Western Elec. Co., 614 F.2d 1300, 1307 (5th Cir. 1980); Zambuto v. AT & T Co., 544 F.2d 1333, 1335 (5th Cir. 1977).  "The premise that underlies this rule is that until the charging party receives notice of the type described above, he is entitled to continue to rely upon the efforts of the EEOC." Whitehead v. Reliance Ins. Co., 632 F.2d 452, 459 (5th Cir. 1980).  If the above requirements are met by a particular EEOC notice, the fact that the EEOC later issued a formal right-to-sue letter does not imply that a plaintiff's receipt of the prior notice was ineffective to commence the 90-day period, at least where the formal right-to-sue notice was received more than 90 days after receipt of the prior notice.  Compare Hefner v. New Orleans Public Service, Inc., 605 F.2d 893, 895-96 (5th Cir. 1979), with Page, 556 F.2d at 351.  Moreover, in order to be effective, it is not required in this circuit that the notice expressly inform the plaintiff that he or she has 90 days from the receipt thereof to file a judicial action.  Page v. United States Industries, Inc., 556 F.2d 346, 351 n.2 (5th Cir. 1977).  Finally, notice to an attorney who is formally representing complainant in a proceeding before the EEOC constitutes notice to a complainant and begins the running of the 90 days allowed for filing a Title VII action.  See Chapman v. Travalco, U.S.A., Inc., 973 F.Supp. 1045, 1047 (S.D. Fla. 1997); Decker v. Anheuser-Busch, 632 F.2d 1221 (5th Cir. 1980), vacated and remanded for additional fact finding, 670 F.2d 506 (5th Cir. 1982) (en banc).  See also Irwin v. Department of Veterans Affairs, 498 U.S. 89 (1990).

Plaintiff's claims alleging discrimination in violation of Title VII and alleging retaliation in violation of the ADA are clearly timely if the start of the 90-day period is based upon Plaintiff's receipt of the formal right-to-sue notice mailed to her on March 31, 2000. However, it is equally certain that those same claims are untimely if the 90-day period began with Plaintiff's counsel's receipt of the letter from the EEOC dated August 31, 1999, as this action was not filed until about 279 days after that letter was apparently mailed. As it appears that the Settlement Agreement does not purport to resolve Plaintiff's federal claims, perhaps the EEOC's decision to cease its actions with respect to Plaintiff's pending May 4, 1999 charge was ill considered. However, that is not the point. What is important, rather, is that in the August 31, 1999 letter sent to Plaintiff's counsel, the EEOC clearly represented that it was taking "no further action" on Plaintiff's behalf and that it was going to "discontinue its investigation of" her May 4, 1999 charge, in light of the Settlement Agreement. Upon receipt of that letter through her counsel, Plaintiff could no longer reasonably rely upon the efforts of the EEOC with respect to her then-pending charge. Therefore, the Court concludes that, as it was clear that the EEOC's administrative proceedings were then at an end, the 90-day period applicable to Plaintiff's claims brought under Title VII and the ADA commenced. Accordingly, Plaintiff's claims brought under those statutes are untimely. See Hefner, supra (holding that the 90-day period to file suit under Title VII began with plaintiff's receipt of a letter from the EEOC advising him that it would not be investigating his pending charge because the EEOC believed it lacked jurisdiction to do so; regardless of whether the EEOC's assessment of its own investigatory powers was correct, the plaintiff's suit filed more than 90 days after receipt of that

notice was barred as untimely, notwithstanding that it was filed within 90 days of the plaintiff's receipt of a formal right-to-sue notice sent by the EEOC more than 90 days after the original notice was received).   The Court concludes that Defendants' motion for summary judgment is due to be granted insofar as it pertains to Plaintiff's discrimination and retaliation claims brought pursuant to Title VII and the ADA.

However, parties proceeding under § 1981 and § 1983 are not required to pursue administrative remedies with the EEOC or otherwise.  See <u>Hines v. D'Artois</u>, 531 F.2d 726, 736 (5th Cir. 1976) ("Congress, in drafting Title VII, was careful to preserve the right to pursue remedies under § 1981 and § 1983 independent of any requirement that EEOC and Title VII remedies first be exhausted").   Thus, Plaintiff's claims brought pursuant to § 1983, which also encompass her § 1981 race discrimination claims, are unaffected by her failure file this action within 90 days of receipt of the August 31, 1999 letter from the EEOC.

### F.  The Merits of the Retaliation Claims

Defendants argue that they are entitled to summary judgment on the merits of Plaintiff's claims alleging unlawful retaliation.  Because the Court has concluded that Plaintiff may not maintain a retaliation claim under Title VII, § 1981, or the ADA, the only remaining vehicle for such a claim is § 1983.  A claim that a party's public employer has retaliated against her based upon her expressive activity, including complaints of discrimination, is cognizable under § 1983 only as a violation of the First Amendment.  <u>Watkins</u>, 105 F.3d at 1354.  In <u>Anderson v. Burke County, Ga.</u>, 239 F.3d 1216 (11th Cir. 2001), the Eleventh Circuit stated:

> For a public employee to sustain a claim of retaliation for protected speech under the First Amendment, the employee must show by a

preponderance of the evidence that: (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a substantial part in the employer's decision to demote or discharge the employee. See <u>Bryson v. City of Waycross</u>, 888 F.2d 1562, 1565 (11th Cir. 1989). Once the employee succeeds in showing the preceding factors, the burden then shifts to the employer to show, by a preponderance of the evidence, that 'it would have reached the same decision... even in the absence of the protected conduct.' <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 [ ] (1977).

239 F.3d at 1219-20.

Defendants address the merits of Plaintiff's retaliation claims in the context of the burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981), which is routinely applied to retaliation claims involving circumstantial evidence, where such are brought pursuant to Title VII, the ADA, and the ADEA  See <u>Johnson</u>, 234 F.3d at 511 n.10. However, the Eleventh Circuit has questioned whether a pure <u>McDonnell Douglas</u> approach is entirely appropriate in First Amendment employment retaliation cases. See <u>Lee v. Russell County Bd. of Educ.</u>, 684 F.2d 769, 774 (11th Cir. 1982); <u>Lee v. Conecuh County Bd. of Educ.</u>, 634 F.2d 959, 962 (5th Cir. Jan. 1981). Cf. <u>Waters v. Churchill</u>, 511 U.S. 661, 677 (1994) (indicating that while a showing of an employer's good faith alone may be sufficient under many federal laws to answer a plaintiff's claim of pretext, such good faith does not alone satisfy the requirements of the First Amendment).  Nonetheless, it is clear that many of the issues and

arguments relating to claims alleging discrimination on the basis of race or protected complaints of discrimination may also translate to claims alleging unlawful retaliation under the First Amendment, and vice versa, given that a central focus in both types of cases is whether an employer took adverse action against an individual based upon an a prohibited consideration. See, e.g., Texas v. Lesage, 528 U.S. 18, 21 (1999) (recognizing that the "same decision" principle originating in the context of § 1983 First Amendment retaliation cases applied with equal force to § 1983 equal protection race discrimination claims ); Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (applying the "same decision" rule to Title VII claims); Holley v. Seminole County School Dist., 755 F.2d 1492, 1505 (11th Cir. 1985) (holding in a First Amendment retaliation case that, under McDonnell Douglas, the trial court had improperly excluded evidence tending to show that the public employer's proffered reason for an adverse action was merely a pretext). Thus, the Court will examine Defendants' arguments in support of their assertion that the evidence shows that they did not unlawfully retaliate against Plaintiff, as those arguments apply in the context of a § 1983 First Amendment claim.

Defendants do not dispute that Plaintiff engaged in protected expression for purposes of a retaliation claim by virtue of her filing of EEOC charges. Thus, the Court will make that assumption as well, although it is not clear in this circuit that filing EEOC charges is actually protected under the First Amendment.[23]

---

[23]As noted previously, the filing of EEOC charges is considered protected activity for purposes of a retaliation claim brought under Title VII, the ADA, and the ADEA. It is not at all certain, however, that filing such charges is constitutionally protected speech for purposes of a First Amendment claim brought under § 1983, as it is questionable whether a plaintiff's complaint to the EEOC alleging unlawful discrimination against her only truly implicates a matter of public concern. While the Eleventh Circuit has held that an official was entitled to

Nonetheless, the Court concludes that the evidence in the record, regardless of whether considered under a "First Amendment analysis" or a burden shifting/pretext framework, is simply insufficient to allow a trier of fact reasonably to find that Plaintiff's termination or other adverse action was motivated, even in part, by the fact that she had filed EEOC charges, given the admitted truth and the gravity of every specific failing on the part of Plaintiff that was cited by Godeke and Commissioner Buckelew as justifications for Plaintiff's termination, namely:

It is true that at the time Godeke recommended Plaintiff's termination in November 1998, purportedly for reasons relating to her poor attendance, he was aware that Plaintiff had previously filed an EEOC charge in February 1997 alleging disability discrimination and an amendment thereto in about June or July 1997. That alone, however, is not sufficient to indicate that Plaintiff's termination was motivated by her filing of EEOC charges, given that it was about nineteen months between the time Godeke received notice of Plaintiff's EEOC charge in March 1997 and her eventual termination.  Plaintiff attempts to establish a connection by suggesting that, upon receiving notice of that first charge from the EEOC, Godeke undertook a campaign to document Plaintiff's inadequacies in order to have her terminated.  If building a file was, in fact, Godeke's plan, the record shows that

---

qualified immunity on a § 1983 because it was not <u>clearly established</u> at that time whether an EEOC charge constituted speech protected by the First Amendment, that court stopped short of addressing the analytically separate question of whether or when such speech is, in fact, on a matter of public concern.  See <u>Badia v. City of Miami</u>, 133 F.3d 1443, 1445-46 (11th Cir. 1998). The court did, however, note a circuit split on the issue.  <u>Id.</u>  But because Defendants do not contest that Plaintiff's EEOC charges constituted protected activity for purposes of a retaliation claim of any stripe, the Court will not further examine the issue.

Plaintiff's subsequent pitiful attendance record and repeated failures to provide doctor's excuses gave him plenty of material to carry it out. Indeed, Plaintiff's primary argument is that her attendance and failures regarding her supplying of doctor's excuses were really about as _bad_ in the period leading up to her termination as it had been in years past, implying that her misconduct cannot alone explain the timing of her termination. However, the evidence shows that Plaintiff received numerous written and verbal reprimands relating to her attendance both before and after filing an EEOC charge. And despite her assertions to the contrary, the record clearly shows that her attendance record in her last year, 1998, was, in fact, materially worse than it had been in years past, in terms of (1) total hours missed, (2) hours missed relative to hours she could have possibly worked, and (3) absences that were deemed unexcused.

Plaintiff also makes much of the fact that Godeke admittedly consulted with the county attorney to determine the possible legal ramifications of taking disciplinary action against Plaintiff because of her absences, in light of the fact that she had filed EEOC charges. But the probative value of this evidence is extremely weak, at best. Likewise is the evidence of the single statement by Godeke offered by Plaintiff that, she says, indicates he was hoping to fire her because she had filed an EEOC charge. On May 15, 1997, Godeke composed a memorandum documenting the course of a meeting he had the day before with Plaintiff and Ann Randolph pertaining to the former's continued attendance problems. In particular, he discussed with her that she had been absent eight days in the preceding two-and-a-half months since his last disciplinary meeting with her and she had failed to provide doctor's notes for these absences. In the memorandum, Godeke wrote,

among other things, that he had stated to Plaintiff during the meeting, "One of us is going to probably lose their job over this, and I prefer to keep mine."  Plaintiff would suggest that Godeke's use of the word "this" refers to Plaintiff's filing an EEOC charge.  This reading, however, is wholly implausible.  There is absolutely no indication that Plaintiff's EEOC charge, of which Godeke had received notice about two months earlier, was ever raised as a topic of discussion between Godeke and Plaintiff at this meeting or otherwise, and it is clear from the context of the memo[24] that Godeke was speaking of Plaintiff's attendance failures cited above. Summary judgment will be granted on Plaintiff's § 1983 retaliation claim based on the First Amendment.  It might be assumed that Defendants could not terminate Plaintiff because she had filed charges with the EEOC.   On the other hand, the First Amendment by no means requires Defendants to endure indefinitely Plaintiff's habitually poor work performance simply because she had filed an EEOC charge.

### G.  The Merits of the Race Discrimination Claims

Other than the arguments that have been discussed above, Defendants do not advance any theory directed specifically at the propriety of summary judgment on Plaintiff's remaining claims against Defendants alleging intentional race discrimination, brought pursuant to § 1983, which also encompass parallel claims under § 1981.  Nonetheless, the Court concludes that the evidence in the record created thus far is sufficient to indicate that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law on such claims. Plaintiff admitted at her deposition that she never heard Godeke or any other

---

[24]The memo is recited in its entirety in the "Background" section of this opinion.

supervisor ever use language that might be construed as indicative of racial bias. Thus, in the absence of direct evidence, Plaintiff would have to prove these § 1983 claims using circumstantial evidence, rendering applicable the McDonnell Douglas burden shifting framework. See Koch v. Rugg, 221 F.3d 1283, 1298 n.31 (11th Cir. 2000); Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1082 (11th Cir. 1996). Under this framework, the plaintiff must first establish a prima facie case of discrimination, which creates a presumption of discrimination. The employer must then produce sufficient evidence to indicate that it took the employment action for one or more legitimate, nondiscriminatory reasons. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are merely a pretext for unlawful discrimination. See McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-256.

It might be assumed that Plaintiff could establish a prima facie case, although such is by no means assured given the likely difficulty finding a comparator with a similarly poor attendance record. However, it is clear that Defendants have satisfied their intermediate burden under McDonnell Douglas to produce evidence sufficient to allow a finding that the decision to terminate Plaintiff was based upon reasons other than race. Specifically, the evidence indicates that Commissioner Buckelew decided that Plaintiff should be fired for the same reasons that Godeke and Randolph recommended that Plaintiff should be disciplined; that is because of (1) her poor overall attendance record since being transferred to the Revenue Department in 1987; (2) her being absent without leave a total of 247.25 hours (30.90 days) during the 1998 calendar year; and (3) her failure to provide sick slips

for her absences between August 17 and October 27, 1998.

In order to prevail at the pretext stage, Plaintiff would have to show either (1) that each of the legitimate reasons offered by Defendants should not be believed or (2) that, in light of all the evidence, race was more likely a motivation for the employment decision. See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997), cert. denied, 118 S.Ct. 685 (1998); Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996). See also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," but cautioning that such a showing may not always be adequate to sustain a finding of unlawful discrimination).   In light of the Court's prior discussion and resulting conclusions with respect to the admitted truth of each of the justifications offered by Defendants, the Court determines that the evidence is simply insufficient  to allow a finding of pretext on Plaintiff's race discrimination claims.  Thus, summary judgment appears to be warranted on these claims at this time.  However, as Defendants did not specifically argue this ground in connection with Plaintiff's race discrimination claims, the Court will allow Plaintiff the opportunity to file evidence or argument demonstrating that there is a fact issue on these claims requiring a trial.  See Fed. R. Civ. P. 56(c); Burton v. City of Belle Glade, 178 F.3d 1175, 1204 (11th Cir. 1999); Massey v. Congress Life Ins. Co., 116 F.3d 1414, 1417 (11th Cir. 1997).

## IV.  CONCLUSION

Based on the foregoing, Defendants' motion to strike (Doc. 45) is due to be

**DENIED.**  Defendants' motion for summary judgment (Doc. 33) is due to be **GRANTED IN PART.**  It is due to be **GRANTED** as to (1) Plaintiff's claims alleging race discrimination under Title VII; (2) her claims alleging unlawful retaliation under Title VII, § 1981, § 1983, and the ADA;  and (3) as to her claims against Godeke in his individual capacity.  As the Court has determined that there is no genuine issue of fact and that Defendants are entitled to judgment as a matter of law on such claims, they shall be dismissed with prejudice.  This would leave Plaintiff's § 1983 race discrimination claims against the Commission and Godeke in his official capacity only, which encompasses Plaintiff's parallel § 1981 claims, as the sole claims remaining viable in this case.  However, although the ground was not specifically argued by Defendants, the Court has concluded that summary judgment appears warranted on these claims as well, because the evidence demonstrates that Plaintiff cannot show that Defendants' proffered reasons for firing Plaintiff are merely a pretext for race discrimination.  But because this ground was not specifically argued, the Court will give Plaintiff the 10 days required under Fed. R. Civ. P. 56(c) to file evidence or argument showing that there is a genuine issue of fact remaining on her § 1983 race discrimination claims, requiring resolution by a jury.

Likewise, the Court has determined, <u>sua sponte</u>, that the record shows summary judgment is warranted on Defendants' counterclaims.  This is based upon the Court's conclusion that the terms of the Settlement Agreement of July 26, 1999 do not purport to resolve or preclude the claims Plaintiff has brought in this action alleging violations of the federal civil rights laws.  But because Plaintiff has not formally moved for summary judgment on such counterclaims, Defendants will be

*ie. until 12:00 Noon on July 30, 2001,*

given 10 days to show that there is a genuine issue of material fact for trial before such counterclaims are dismissed.  A separate order will be entered.

**IT IS SO ORDERED**, this ___19th___ day of July, 2001.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE